Raymond L. Sabath, etc., et al., Plaintiffs-Appellees, v. City of Chicago, a Municipal Corporation, et al., Defendants-Appellants. David J. O'Meara, et al., Intervenors.

### Gen. No. 49,366.

First District, First Division.
February 15, 1965.
Rehearing denied April 5, 1965.

John C. Melaniphy, Corporation Counsel, of Chicago
(Sydney R. Drebin, Assistant Corporation Counsel,
and Allen Hartman, Special Assistant Corporation
Counsel, of counsel), for appellants.

Deutsch & Peskin, of Chicago (Arthur J. Baer, Jr.,
of counsel), for appellees.

MR. JUSTICE MURPHY delivered the opinion of
the court.

Defendants appeal from a declaratory judgment
order, which (1) found and declared that plaintiffs'
use of their premises was "a legal nonconforming use
under the Zoning Ordinance of the City of Chicago,"
and (2) directed that a commercial driveway permit be
issued for the subject premises after finding that a
driveway would neither create undue safety hazards
in the use of the street and sidewalk nor impede the
safe and efficient flow of traffic thereon.

The plaintiff, Raymond L. Sabath, is engaged in the wholesale meat business and does business under the names of Century Packing Company and Century Provision Company, and has operated a meat packing and storage plant at 3826–3830 Emerald Avenue since 1954. The defendants are the City of Chicago, Lloyd M. Johnson, Commissioner of the Department of Streets and Sanitation, and John F. Maloney, Zoning Administrator of the City of Chicago. Certain owners of nearby residence property were granted leave to file intervening petitions, which alleged, in part, that plaintiffs' use of their premises constituted an enjoinable nuisance. They participated in the trial, but have not joined in this appeal.

The premises are contained within a square block bounded by 38th Street on the north, Emerald Avenue on the east, Pershing Road (39th Street) on the south, and Halsted Street on the west, in the City of Chicago. The block is divided into 50 lots and is bisected by an alley, 18 feet wide, running north and south in direction, located between Halsted Street and Emerald Avenue, with ingress and egress at the north from and into 38th Street, and at the south from and into Pershing Road. The tier of twenty-five lots facing Emerald Avenue is consecutively numbered from Lot 1 at the south end nearest Pershing Road to Lot 25 at the north end nearest 38th Street. Plaintiffs' premises consist of Lots 6, 7, 8, 9, 10, 11, 12, 13 and 14. Each lot has 24 feet of frontage on Emerald and a depth of 125 feet to the west.

The first structure on any part of the premises was erected in 1917 on Lots 7, 8 and 9, for use as a meat slaughtering plant, by a firm known as City Abbatoir. A loading dock was located at the south end of the premises, set back about 18 feet from Emerald, with ingress and egress to and from Emerald. There were

309

three residences located to the north on Lots 12, 13 and 14. Lots 10 and 11 were set aside for use as a cattle pen.

In the early 1930's the Empire Packing Company, also a meat slaughterer, took possession of the premises, and in 1935 constructed a meat cooler on Lots 10 and 11, by adding three walls onto the existing building, with the north wall of the old building serving as a common wall between the two buildings. No part of the new addition was ever used for loading or unloading by Empire. In 1935, the residence on Lot 12 was demolished; in 1945, the residence on Lot 13 was burned down; and in the late 1940's, the residence on Lot 14 was demolished. Lots 12, 13 and 14 all remained vacant and were not used for loading, unloading, parking or driveway purposes until 1954. On Lot 15, there was and is a residence continuously occupied.

In 1954, the premises were occupied by plaintiffs under a lease. In March, 1956, plaintiffs purchased Lots 6 through 14. The cooler building, standing on Lots 10 and 11, was still intact. This building is three stories in height, approximately 50 feet wide and 120 feet deep, and is set back 6 feet from the east line of the subject premises, extending to the alley to the west. In 1954, the plaintiffs remodeled it, made interior changes, and added a loading dock to the north wall of the building. The loading dock is approximately 15 feet wide, extending these 15 feet into Lot 12. It is 66 feet long, commencing 14 feet west of the east property line of the premises, ending about 46 feet east of the west property line, the alley. The distance from the north edge of the loading dock to the north lot line of the subject premises is approximately 55 feet. The dock contains six bays or doors, each of which is 8 feet wide and 10 feet high. The balance of Lot 12 and all of Lots 13 and 14 were paved with concrete, and a driveway, about 23 feet in width, was

installed on Lot 14 to provide ingress and egress to and from Emerald Avenue.

Plaintiffs never used the building to the south, located on Lots 7, 8 and 9, and subsequently demolished it. The area was filled with the rubble from the demolished structure, and is being used, along with Lot 6, for off-street parking of plaintiffs' employees' automobiles, for vehicles awaiting their turn at the loading dock, and is also leased on a nighttime basis to neighboring businesses for truck parking. Ingress and egress to and from this area is provided by the 18-foot public alley to the west. The dimensions of this area are 96 feet by 124 feet. The property to the south of Lot 6, extending to Pershing Road, is also vacant.

Sometime in 1953 or 1954, plaintiffs submitted plans and specifications for remodeling of the premises and construction of the loading dock to the Building Department of the City of Chicago, which were approved by the Department. No driveway was shown on the plot plan, which was included in the plans and specifications submitted to the City. The required application for a driveway permit was not made by plaintiffs in 1954, when the driveway was established, and no driveway permit was ever issued to anyone, nor were driveway fees paid by anyone for the driveway. In October, 1961, the plaintiffs filed the commercial driveway permit application involved here with the Department of Streets and Sanitation of the City of Chicago. The application was returned to plaintiff Sabath, marked "R.3 Not Approved." The accompanying letter stated: "The Department of Buildings has returned your Driveway Application without a zoning approval." It appears, therefore, that plaintiffs' application was rejected because it was not deemed to be in conformity with the R3 General Residence District zoning of the property under the 1957 amendment. Thereafter, an appeal was taken to the Mayor of Chicago, pursuant

to provisions of the Municipal Code, which appeal was denied. Thereupon, plaintiffs instituted the present action.

Plaintiffs do no slaughtering on the premises but purchase dressed carcasses of beef, cut the meat, package it, and distribute it throughout the country through various retail chains, governmental institutions, and hotel and restaurant supply purveyors. They receive approximately 20 trailers of meat per week; the trailers average from 32 to 38 feet in length. In addition, they receive both trailers and vehicles of a smaller design which come to the plant for the purpose of picking up produce for local delivery or out-of-state shipment. For pickup purposes, they average four trailers and six smaller units per day.

The voluminous evidence consisted of exhibits and testimony. The exhibits included plans and specifications submitted to the Building Department of Chicago by plaintiffs in 1954, two 1961 applications by plaintiffs for a commercial driveway permit and pertinent correspondence, zoning maps and ordinances, traffic volume studies, and many photographs. The witnesses included plaintiff Sabath, City employees, traffic experts, and numerous intervenors—residents of the immediate area. Plaintiff Sabath and the intervenors testified as to the historical and current use of the premises, its incidental operations and use of the driveway.

There are two issues in this appeal: (1) the determination of the zoning status of the subject premises under the 1942 amendment, and (2) whether the driveway on Lot 14 created an undue traffic and safety hazard, impeding the safe and efficient flow of traffic.

As to zoning, the first issue, the trial court found: "4. All of said improvements were completed and occupied by plaintiffs in March, 1954, having been constructed pursuant to a building permit duly issued

312

in 1953. The use district maps of the Zoning Ordinance then applicable placed the building in a manufacturing district and the northernmost lot of the loading court fell in a commercial district. 5. Under the applicable provisions of the Zoning Ordinance then in effect plaintiffs' use, including building, dock and loading court, was permitted and lawful and was permitted and lawful at the time of the adoption of the 1957 Chicago Zoning Ordinance, now in effect. 6. Plaintiffs' use of the subject premises is substantially unchanged since its inception in 1954 and constitutes a legal nonconforming use under the Chicago Zoning Ordinance." The court then declared that plaintiffs' use of its premises "consisting of a three story building, attached loading dock and paved loading Court, is a legal nonconforming use under the Zoning Ordinance of the City of Chicago."

As defendants concede that plaintiffs' business of meat packing and distribution is a permitted use on Lots 6 through 11 under the 1957 amendment, we are concerned only with plaintiffs' use of Lots 12, 13 and 14—the loading dock, paved loading court, and driveway. The 1957 amendment places Lots 12, 13 and 14 in an R3 General Residence District, which does not permit the use plaintiffs make of these lots. (Section 7.3–3.) Neither does the 1957 amendment allow this use to be classified as an "accessory" use, which must be "located on the same zoning lot as the . . . principal use served." (Section 3.2.)

Plaintiffs contend that although their use of Lots 12, 13 and 14 is not a "permitted use" under the 1957 amendment, their use of these lots can be continued under the terms of section 6.2 of the 1957 amendment, which reads:

"6.2 Any nonconforming use . . . which existed *lawfully* at the time of the adoption of this

313

comprehensive amendment and which remains nonconforming, and any such use . . . which shall become nonconforming upon the adoption of this comprehensive amendment . . . may be continued . . . subject to the regulations which follow." (Emphasis supplied.)

The plaintiffs argue that this section applies because their use of these lots was "permitted" under the terms of the 1942 amendment and, therefore, "lawful."

The defendants argue, on the other hand, that these uses were "unlawfully" nonconforming at the time of the adoption of the 1957 amendment, so that section 6.2 cannot be applied to sanction the continuation of these uses. Therefore, a determination is required of the legal status of plaintiffs' uses of Lots 12, 13 and 14 under the zoning law prior to 1957.

The zoning law applicable to plaintiffs' use of these lots, which commenced in 1954, is the 1942 amendment to the Chicago Zoning Ordinance. Section 3 of the 1942 amendment makes the accompanying use district maps a part of the ordinance.

"Section 3. District classification—maps. . . . the city of Chicago hereby is divided into 9 classes of use districts and 4 classes of volume districts as shown on the following described maps which hereby are made a part of this ordinance."

Use District Map 26 encompasses the subject premises and reveals that the block on which the subject property is located is divided into two use districts—a Manufacturing District, which occupies the southern end of the block, and a Commercial District, which occupies the northern end of the block, but Map 26 does not employ figures to indicate the dimensions of either of these use districts. We agree with plaintiffs

314

that "the situs of plaintiffs' premises in relation to the boundary between these two districts is determinative of whether or not plaintiffs' use, established under the 1942 ordinance, was a permitted use."

Plaintiffs' witness, George H. Kranenberg, a planning and zoning consultant, testified he had been the deputy director of the Chicago Plan Commission and technical director of the staff which developed the 1957 Comprehensive Amendment to the Chicago Zoning Ordinance, and was responsible for the development of the ordinance text and the district zoning maps. He testified, as to the block in which the subject premises are located, that the manufacturing district extends to the south line of 38th Place when extended. "In inspecting plaintiffs' Exhibit 4 [the plat of the subdivision], the south line of 38th Place could—the south line of 38th Place coincides almost exactly with the northern line of lot thirteen. . . . It would be my opinion from looking at this exhibit that . . . the first five or six feet of that lot [Lot 14] under the '42 Ordinance would be in the manufacturing district."

Defendants' witness, Arthur H. Kvale, a legal investigator assigned to the Zoning Division of the Corporation Counsel's office of the City of Chicago, a zoning investigator for 19 years and familiar with the 1923, 1942 and 1957 Chicago zoning ordinances, examined Use District Map 26, and testified that the manufacturing district "extends to the south line of 38th Place. . . . Maybe five or six feet off. . . ." Under cross-examination, he testified that under the 1942 amendment the commercial zone "extended from the south lot line of Lot 14 to and including the north line of Lot 25. The manufacturing extended from the south line of Lot 3 to the north line of Lot 13." Kvale also testified that plaintiffs' building and loading dock facilities, located in the manufacturing zone,

315

were permitted uses under the 1942 amendment, and that plaintiffs' driveway on Lot 14, located in the commercial zone, could only be used for purposes of ingress and egress under Section 11(7) of the 1942 amendment.

From the foregoing, we conclude the boundary line between the 1942 manufacturing and commercial districts can be fairly located. The line formed by the south edge of 38th Place, if extended east through the subject block, coincides almost exactly with the lot line dividing Lots 13 and 14. This approach results in locating plaintiffs' Lots 6 through 13 in the manufacturing district and Lot 14 in the commercial district.

Plaintiffs' use of Lots 12 and 13, located in a manufacturing district, was a permitted use under Section 12(2) of the 1942 amendment:

> "Where all operations, *including loading, unloading,* storage, . . . are carried on entirely within the lot lines, the following uses are also permitted in Manufacturing districts:
>
> "Beverage, feed, food and food product bottling, canning, packing and distributing; . . . ." (Emphasis supplied.)

Plaintiffs' Lot 14, used for a driveway, providing ingress to and egress from plaintiffs' loading dock and court, is a permitted use in a commercial district under Section 11(7) of the 1942 amendment:

> "Permitted uses in Commercial districts are: . . . Private way for access and ingress to and egress from premises used for manufacturing or industrial purposes; . . . ."

■ In view of the foregoing, we conclude that the trial court was correct in finding that plaintiffs' use of their premises, including Lot 14, "is a legal noncon-

forming use under the Zoning Ordinance of the City of Chicago."

Defendants argue that noises caused by plaintiffs' use of their property exceeds the permissible limits of the Chicago Zoning Ordinance. Defendants cite Dube v. City of Chicago, 7 Ill2d 313, 131 NE2d 9 (1955), and argue from this case that the plaintiffs here "have not acquired a vested right to create or maintain a noisy nuisance in extension and expansion of a previous illegal nonconforming use of the subject premises."

We find no merit in this contention, because of our determination that plaintiffs' use of these lots was permitted under the 1942 amendment.

We consider next the second issue, that part of the instant judgment which directed that a commercial driveway permit be issued "for the construction of a driveway to connect with said lot 14." Plaintiffs state: "A driveway was constructed at the subject location at the time plaintiffs remodeled and occupied their premises. This was admittedly done without a driveway permit. Plaintiffs do not contend that the physical existence of this driveway or its use no matter how long continued confers any rights on plaintiffs or enhances their position in any way. Upon discovery of the lack of a permit (by the City's closing the driveway) plaintiffs applied in due course for such a permit and upon denial, began this suit."

Plaintiffs further state they "have no quarrel with the authorities cited by defendants relating to the power of the City to enact the driveway ordinance or to the rights of the public in streets and sidewalks. But to apply these authorities as defendants argue they should be applied would permit no driveways at all. Note that the driveway ordinance refers to undue safety hazards in apparent recognition of the fact

that we are all exposed to daily traffic hazards which will be with us always."

Plaintiffs argue, "The trial court had the opportunity to hear defendants' witness and consider the deposition in rebuttal and its finding is clearly within the evidence. . . . It cannot be said that such finding is palpably erroneous and it ought not be disturbed." Chiagouris v. Continental Trailways, 50 Ill App2d 196, 200 NE2d 399 (1964).

Defendants contend, "The driveway on the subject property creates undue traffic and safety hazards and impedes the safe and efficient flow of traffic upon Emerald Avenue and upon the sidewalks thereof."

Section 33-17 of the Municipal Code of Chicago provides in part:

> "An application [for a driveway permit] shall be approved and a permit issued only upon a determination of the commissioner of streets and sanitation that the driveway will not (1) create undue safety hazards in the use of the street, parkway or sidewalk by vehicular or pedestrian traffic, nor (2) impede the safe and efficient flow of traffic upon the streets and sidewalks adjoining the property for which the driveway is proposed, *and* upon his determination that the existing and proposed use of the property to be connected by said driveway is in all respects in conformity with existing traffic, zoning, and building ordinances . . . ." (Emphasis supplied.)

■■ This section of the Municipal Code promulgates three standards which this court must apply in determining the right of plaintiffs to a driveway permit. The plaintiffs are entitled to the driveway permit only if (1) the driveway would not create "undue safety hazards"; (2) it would not "impede the safe and efficient flow of traffic"; and (3) it does and will con-

form, in "all" respects, to "existing traffic, zoning and building ordinances." In addition, certain other general principles of law are applicable in determining plaintiffs' rights. As argued by the defendants, the basic purpose of having streets and sidewalks within a municipality is to afford a public way for pedestrian and vehicular traffic. The public is rightfully entitled to the use of such thoroughfares free of all obstructions and impediments which tend to delay or obstruct traffic. (People ex rel. Armanetti, Inc. v. City of Chicago, 415 Ill 165, 167, 168, 112 NE2d 616 (1953).) An abutting property owner, for his convenience, has a right to make proper and reasonable use of the sidewalk and street, but only to the extent that such use is not inconsistent with the paramount right of the public. City of Elmhurst v. Buettgen, 394 Ill 248, 251, 68 NE2d 278 (1946).

We believe that the following excerpts from Town of Tilton v. Sharpe, 85 NH 138, 155 A 44 (1931), state the interpretation which must be given to the concept of the property owner's "proper and reasonable use" in determining the relationship of this concept to the standards promulgated by Section 33–17 of the Municipal Code.

" . . . [T]he test of the reasonableness of the proposed use is to be found, not by inquiring whether such use is essential to the profitable transaction of any particular business on his lot, but in answer to the inquiry whether such use would be fraught with such unusual hazard that the danger to the traveling public would be out of proportion to the detriment to the owner of being deprived of it. The convenience or necessity of the owner constitute but one side of the question. Upon this, the character of the use and the

accessibility of his lot at other points are material factors. . . ."

The record shows Emerald Avenue is the first street east of Halsted Street between 26th and 47th Streets. It is one-way southbound and operates as the southbound half of a one-way pair, consisting of Emerald Avenue and Union Avenue, the next street east, which is northbound one-way. Emerald Avenue is approximately 36 feet from curb to curb and is located on a 66-foot right-of-way. The street contains two 7-foot parking lanes, one on each side of the street, and two 11-foot traffic travel lanes. The tonnage limitation on Emerald Avenue is five tons gross load, which means the weight of the vehicle plus any load that may be contained within the vehicle. There are stop and go signals on Emerald Avenue at about two block intervals.

In order to reach plaintiff's loading dock, vehicles can approach from any one of several directions: from the north or south through the north-south alley, west of the premises, coming off either 38th Street or Pershing Road; or from the north on Emerald Avenue, through the driveway which is the subject of the instant litigation. Those vehicles approaching the subject property from Emerald come directly south on Emerald from north of 38th Street, or come off Halsted Street, eastbound onto 38th Street, turning southbound onto Emerald.

Plaintiffs submitted the testimony of Paul W. Schuldiner, an assistant professor of civil engineering at the Technological Institute of Northwestern University. On a Sunday afternoon, he studied the area in which the subject property was located. He had never done traffic consultant work in the City of Chicago and was unaware of the requirements for commercial driveways in Chicago. He made no investiga-

tion to learn load weights of the trucks that enter the subject property, although he knew Emerald Avenue was a residential 5-ton load limit street. He relied upon a traffic count taken at noon on the Sunday on which he was present at the subject premises. Testifying from the City's traffic volume study and his observation of the scene, he concluded that the driveway in question offered no undue hazard and was, in fact, preferable to subjecting 39th Street to any additional load.

An investigation of the proposed driveway on the subject property was made by the Bureau of Street Traffic, Department of Streets and Sanitation. Albert L. Forde, in charge of traffic planning and engineering in the Bureau of Street Traffic, testified that Emerald Avenue, a one-way southbound street, was predominantly residential in character and was posted with 5-ton gross load limit signs in compliance with the city ordinance. A traffic volume count, previously taken, had demonstrated a disproportionately high percentage of commercial vehicles using this residential street. Defendants' Exhibit 2, a series of traffic studies showing the minimum turning radii of the various types of vehicles using the subject premises, was prepared under Forde's direction and supervision, using standards promulgated by the American Association of State Highway Officials and adopted by the Bureau of Public Road. These studies resulted in the following determination: "a single-unit truck, with a turning radius of forty-five feet, can enter plaintiffs' driveway from southbound on Emerald Avenue, provided it makes its entry from the extreme eastern southbound lane, cutting across the western southbound travel lane in doing so, and that such a vehicle may leave the premises via the driveway again by cutting across the western travel lane into the eastern travel lane. Semi-trailer trucks with overall lengths of forty-three feet

and fifty feet could enter the driveway from the north, provided that they practically scrape the sides of cars parked on the east side of Emerald Avenue and then cut across the western southbound travel lane, requiring a reverse procedure upon leaving the subject property via the driveway." In his opinion, Forde asserted that any time a vehicle cuts across a through travel lane, a traffic hazard is thereby created.

Forde observed at least sixty units of the 50-foot length variety eastbound on 38th Street, turning south on Emerald, which were required to be positioned in the westbound traffic lane, or the wrong side of the street, in order to make the turn onto Emerald. Cars are never parked on the east side of Emerald for the first 60 feet south of 38th Street, since the trucks turning from eastbound to southbound invariably barely missed the east curb and would strike any vehicle parked in that length of street or would be required to stop, back up, and maneuver around in order to negotiate the turn without striking parked vehicles. Forde testified that, starting at 3:00 p. m., there are six signal cycles for the traffic light at Pershing Road and Emerald Avenue. These cycles, according to Forde, backlog the traffic southbound on Emerald all the way north of the subject driveway. During these cycles, there could be no movement into or out of the driveway, and any efforts to enter or leave the driveway would result in undue and unnecessary delay in traffic movements on Emerald Avenue.

Based upon the foregoing facts, Forde was of the opinion that: plaintiffs' driveway injects unnecessary and unneeded traffic hazards for vehicles on Emerald, and, with their weight and size, these vehicles operate as a detriment to the residential area; vehicles using the alley to the west of the subject property, with ingress and egress at 38th Street on the north and Pershing Road on the south, are able to negotiate

turns into and out of the alley without difficulty, and such vehicles can enter the subject property from the alley and maneuver about on the apron located next to the alley on the subject property, without injecting any hazard or detriment to Emerald Avenue traffic, because the maneuvering is done on the subject property and not in the public way.

Defendants' witness Kvale testified that he had been to the subject property on eight or nine occasions and observed that the long trailer trucks entering and leaving the subject property had to go all the way over to the east travel lane of Emerald Avenue and make a sharp turn in order to enter or leave the plant. It was his opinion that the use of the driveway at the plaintiffs' plant was detrimental and created a traffic safety hazard. This opinion was based on the fact that Emerald Avenue was a heavily traveled street from 26th Street to 51st Street. He was of the opinion that any driveway located on Emerald Avenue would create a hazard unless the driveway were wide enough to eliminate the necessity for trucks to move into the extreme east lane of traffic in order to make a right-hand turn, thereby blocking other traffic moving in the east lane.

The foregoing testimony was buttressed by testimony of intervenors' witnesses, who detailed specific instances of various traffic situations created by vehicles being received on the subject premises, including traffic congestion, double parking of vehicles on Emerald Avenue near and adjacent to the subject property, semitrailer trucks parked next to fire hydrants, and vehicles blocking the west sidewalk of Emerald at plaintiffs' driveway.

■ After a careful consideration of the evidence and the factors involved here, we believe that an opposite conclusion to that of the trial court is clearly apparent. The public is rightfully entitled to the use

of Emerald Avenue, free of all obstructions and impediments which tend to delay or obstruct traffic. An abutting property owner, for his convenience, has a right to make a proper and reasonable use of the sidewalk and street, but only to the extent that such use is not inconsistent with the paramount right of the public. (People ex rel. Armanetti, Inc. v. City of Chicago, 415 Ill 165, 167, 168, 112 NE2d 616 (1953).) The evidence shows that plaintiffs have adequate access to their present loading dock through the alley on the west, and that the instant driveway will "(1) create undue safety hazards in the use of the street, parkway or sidewalk by vehicular or pedestrian traffic," and "(2) impede the safe and efficient flow of traffic upon the streets and sidewalks adjoining the property for which the driveway is proposed." Therefore, we hold that the trial court's finding that the driveway will not create undue safety hazards nor impede the safe and efficient flow of traffic should be reversed.

For the reasons given, that part of the instant judgment which declares that plaintiffs' use of their premises is a legal non-conforming use under the Zoning Ordinance of the City of Chicago is affirmed, and that part of the instant judgment directing the issuance of a driveway permit "for the construction of a driveway to connect with said lot 14" is reversed. The matter is remanded with directions to enter a declaratory judgment in conformance with the judgment of this court and for such further proceedings as may be proper.

Affirmed in part, reversed in part, and remanded with directions.

BURMAN, P. J. and KLUCZYNSKI, J., concur.